# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No.   3:18-cr-00079 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| MICHAEL D. BUSCH (1), BUSCH'S COUNTRY CORNER, INC. (3), and AMANDA JO BUSCH (4), | : | |
| | : | |
| Defendants. | : | |

---

**ENTRY AND ORDER DENYING DEFENDANTS' MOTION TO VACATE CONVICTION (DOC. 128)**

---

On February 20, 2020, Defendants Michael D. Busch, Busch's Country Corner, Inc. and Amanda Jo Busch (collectively, "Defendants") filed a Motion to Vacate Conviction (the "Motion"). (Doc. 128.) The United States of America (the "Government") filed a response to the Motion (the "Response"). (Doc. 131.) Defendants filed a reply in support of their motion (the "Reply"). (Doc. 132.) The Motion is ripe for the Court's review. For the reasons discussed below, the Motion is **DENIED**.

## I.   BACKGROUND

### (1) **The Defendants are Convicted**

Michael Busch ("Michael") and Amanda Jo Busch ("Amanda") were the co-owners of Busch's Country Corner, Inc. ("BCC"). (Doc. 113 at PAGEID # 1825.) Michael was a butcher and Amanda was the internal bookkeeper for the business. (*Id.*; Doc. 114 at PAGEID # 1877.)

Trial commenced in this action from June 10, 2019 through June 21, 2019. (*See* Docs. 97,

106-114.) The jury found all three Defendants—Michael, Amanda, and BCC—guilty of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. (*See, e.g.,* Docs. 48 and 97.) The jury also found Michael guilty of eleven counts of SNAP[1] fraud (7 U.S.C. § 2024(b) and 18 U.S.C. § 2) and eleven counts of wire fraud (18 U.S.C. §§ 1343 and 2). (*Id.*)

### (2) Testimony at Trial from Rebecca Reid, Tim Waller, and Randy Busch

During the trial, among other witnesses, Rebecca Reid ("Reid") provided testimony. Reid was employed by BCC for about three-and-a-half years, from approximately 2015 through July of 2018. (Doc. 109 at PAGEID # 1078, 1101.) She generally worked from 8:00 a.m. to 6:00 p.m. on Tuesdays through Sundays, and she would often see Michael and Amanda in the store. (*Id.* at PAGEID # 1079.)

Reid testified that she had been approached by customers at BCC who asked to exchange their EBT benefits for cash.[2] (*Id.* at PAGEID # 1085.) She would tell them "no," and then the customers would ask to speak with Michael or Randy Busch ("Randy"), Michael's brother. (*Id.*)

Reid personally observed Michael exchange EBT cards for cash. (*Id.* at PAGEID # 1086.) She observed him do so "[m]aybe a handful of times," and that those times occurred over the entire course of her employment with BCC. (*Id.* at PAGEID # 1086-87.) She was told by Michael that she (Reid) should not process EBT cards for cash because he "didn't want to get [Reid] in trouble if anything happened." (*Id.* at 1089.) Reid also testified that she personally observed Randy exchange EBT cards for cash. (*Id.* at PAGEID # 1086-87.)

Additionally, Reid saw Michael and Tim Waller ("Waller") exchange EBT cards for cash;

---

[1] SNAP stands for Supplemental Nutrition Assistance Program. It replaced the food stamp program. (*See* Doc. 48; Doc. 108 at PAGEID # 799.)
[2] EBT stands for electronic benefits transfer. (Doc. 108 at PAGEID # 805-06.)

Waller would provide Michael with cards and Michael would provide Waller with cash. (*Id.* at PAGEID # 1088-89.) Reid also testified that Michael or Randy or Amanda would authorize her (Reid) to give credit on EBT cards. (*Id.* at PAGEID # 1089.)

Waller also testified during the trial. Waller had worked at a few businesses at Findlay Market, where BCC was located. (Doc. 109 at PAGEID # 1010.) He was born in the area and knew a lot of people who received food stamps or SNAP benefits. (*Id.* at PAGEID # 1010-17.) Waller testified that he did not want to have to testify at trial against Michael and Amanda, whom he considered his friends. (*Id.* at PAGEID # 1025, 1039.) In the Motion, Defendants admit that Waller "testified generally that Michael Busch regularly and frequently had him obtain EBT cards from SNAP beneficiaries to be processed at Busch's Country Corner in exchange for cash." (Doc. 128 at PAGEID # 2320.)

For example, Waller testified that other individuals outside of Findlay Market would provide him with their food stamp cards, Waller would take those cards inside to Michael, and Michael would "tak[e] stamps off the cards to purchase from the individual[s]" (i.e., the individuals gave Waller their cards to have Michael "take stamps off the card for payment" because each "individual was selling the stamps to Michael"). (Doc. 109 at PAGEID # 1012-14.) An individual would provide Waller with his or her card, Waller would take the card to Michael, and Michael would give Waller a bag to return to the individual (which Waller would then provide to the individual). (*Id.* at PAGEID # 1012-15, 1034-36.) Waller testified that Michael had approached him to go up to certain individuals and that Michael was the one who initiated this process. (*Id.* at PAGEID # 1045.)

Waller also testified that he had been presenting other individuals' food stamp cards to

3

Michael for about eight years, from 2010 to about 2018. (*Id.* at PAGEID # 1015.) He estimated that he did this, "[o]n and off" "[a]bout 30 to 40 times a week" and, over the eight-year period, he did so for at least a couple hundred separate individuals. (*Id.* at PAGEID # 1015-16.) And, Waller testified that the exchanges would take place at any time of the day—from "the time they open until the time they close"—and the exchanges would happen individually (i.e., Waller would not bring Michael all of the cards at one time). (*Id.* at PAGEID # 1034-36.) Waller also testified that it was not true that Michael typically would not be present at BCC after 11:00 a.m. (*Id.*) Waller had seen Michael at Findlay Market "plenty of times after 11 a.m.," and he had seen Michael at BCC all day and close BCC. (*Id.*)

Additionally, Waller testified that he had previously met with the Government and told the Government that he "possibly had seen someone when they pulled something out of the bag [from Michael], like they pulled cash out of the bag at one time or another," although Waller would not go into the bags himself. (Doc. 109 at PAGEID # 1041.) Waller also testified that "[a]t one time or another [he] did see someone pull money out of one of the bags" from Michael. (*Id.* at PAGEID # 1042-43.)

Randy also testified during the trial. Randy worked for BCC from 2009 to 2018. (Doc. 110 at PAGEID # 1191.) He was a defendant in this case and entered into a plea agreement with the Government prior to the trial. (*Id.* at PAGEID # 1202-03.) Randy pled guilty to SNAP fraud. (*Id.*)

Randy testified that there were both legitimate and illegitimate SNAP EBT transactions processed at BCC. (*Id*. at PAGEID # 1199.) According to Randy, both he and Michael engaged in illegitimate SNAP EBT transactions during his tenure as an employee at BCC. (*Id.*) Randy

4

testified that the fraud "was a learned trade," and that he learned how to do it from his brother, Michael, and from other vendors and customers at Findlay Market. (*Id.* at PAGEID # 1199, 1255.) Randy also testified that, during an average week, he illegitimately processed approximately five to ten SNAP benefit cards. (*Id.* at PAGEID # 1205.) He saw his brother, Michael, engage in the same amount of illegitimate food stamp fraud transactions. (*Id.* at PAGEID # 1206.) Randy testified that, on average, he and Michael engaged in 30 to 40 illegal transactions per month. (*Id.* at PAGEID # 1254-55.) This included that, in addition to exchanging cash for EBT cards, both Randy and Michael also engaged in what was termed a "product loan" and would extend cash loans for EBT benefits. (*Id.* at PAGEID # 1200-01.)

### (3) Data Concerning SNAP Transactions

The United States Department of Agriculture ("USDA") maintains a computer database called the Antifraud Locator Using EBT Retailer Transaction ("ALERT"). (Doc. 107 at PAGEID # 768-69.) The ALERT database stores data for all EBT transactions on a transaction-by-transaction basis. (Doc. 127 at PAGEID # 2204.) The government's databases provide its agents with the ability to look up any EBT transaction that is executed by anybody who receives EBT benefits anywhere, any place, and any time. (Doc. 112 at PAGEID # 1560.) The databases can track individual SNAP EBT transactions and can also create monthly summaries of the transactions. (Doc. 131 at PAGEID # 2352.)

Defendants admit that, "[p]rior to trial, the [G]overnment disclosed certain data from the USDA's ALERT database, and certain data from the State of Ohio's Conduit system (which is similar)." (Doc. 128 at PAGEID # 2311.) However, Defendants take issue with not receiving

certain "transactional" data in the databases prior to trial.[3] The databases had tracked 195,113 individual EBT transactions at BCC during the approximately seven-and-a-half year charged time period, and approximately 560,000 individual EBT transactions at stores that the Government had deemed "comparable" to BCC. (Doc. 131 at PAGEID # 2353.) The data includes, for example, the date, time, amount, prior balance on the card, and the transaction method for each of those hundreds of thousands of EBT transactions. It is this more granular "transactional" data that is at issue in the Motion, as opposed to the summary data that it is undisputed the Government did provide to the Defendants prior to trial. (*See* Doc. 128 at PAGEID # 2312 ("The ALERT data disclosed prior to trial was *summary data* (as opposed to the more-detailed *transaction data*). The summary data produced was both for [BCC] as well as certain 'comparable stores' to whom investigative agents compared [BCC] for purposes of investigating and detecting the fraud occurring at [BCC]." (emphasis in original).)

II. **ANALYSIS**

(1) **Arguments by the Parties**

In the Motion, Defendants "move to vacate Defendants' convictions due to the [G]overnment's failure to timely disclose material exculpatory evidence, prior to trial of this matter, in violation of its obligation to do so under *Brady v. Maryland*, 373 U.S. 83, 87 (1963)." (Doc. 128 at PAGEID # 2310.) Defendants allege that the Government "failed to disclose all of the relevant data in the ALERT system." (*Id.* at PAGEID # 2311.) Defendants also allege that

---

[3] According to the Defendants, such "data was not known to exist by the Defendants until [they] engaged an expert witness to study the ALERT data in connection with evaluating the [G]overnment's proposed estimation of loss in this case for sentencing guidelines purposes. Defendants' expert, Mr. Bruce Yasukochi, requested that [the] defense inquire about the existence of the additional data so that it could be obtained and evaluated by the defense expert in connection with rending [sic] his opinion regarding loss in this case." (Doc. 128 at PAGEID # 2311.)

6

this failure to disclose such data derivatively resulted in the Government's failure "to disclose to Defendants that on May 6, 2016, a transaction was initiated at Busch's Country Corner using a government-controlled EBT card." (*Id.*) In the Reply, Defendants specify that they are arguing that the Government committed a *Brady* violation by not disclosing, prior to trial, "the transactional data from the ALERT system for BCC (and [from] the other stores used by the [G]overnment for its 'comparison analysis')." (Doc. 132 at PAGEID # 2361.)

In the Motion, Defendants assert that the transactional data was "highly exculpatory," and that "an analysis of the transaction data in the ALERT system buttresses Defendants' primary defense at trial that Randy Busch alone was responsible for any cash-for-benefits SNAP fraud perpetrated at [BCC] and that any fraud was not on a corporate-wide scale." (Doc. 128 at PAGEID # 2313.) Defendants allege that, if they had the ALERT transactional data and would have known then what they know now, then they could have presented evidence—via expert opinion testimony—at trial that the "obvious inference [from the data] is that in fact there was not widespread fraud (of the kind alleged by the [G]overnment in this case) at [BCC] *at all*." (*Id*. at PAGEID # 2319 (emphasis in original).) Defendants also allege that having the transactional data prior to trial would have allowed them to impeach witnesses. (*Id.* at PAGEID # 2319-20.) Specifically, Defendants allege that "the ALERT transaction data effectively exposes Mr. Waller's testimony – at least regarding the frequency/number of transactions he was involved with – to be a complete fabrication." (*Id*. at PAGEID # 2320.)

In Response, the Government argues that the Defendants fail to establish either the first or third elements necessary to show a *Brady* violation. (Doc. 131 at PAGEID # 2352, 2354.) According to the Government, the "data had absolutely no relevance whatsoever to [any] aspect

7

of the findings phase of trial." (*Id.* at PAGEID # 2354.) It says that "this data never had any relevance whatsoever as to the issue of the defendants' guilt or innocence at trial." (*Id.*) "The [G]overnment's case-in-chief at trial was largely based upon the testimony of co-conspirators (indicted and unindicted), undercover operatives, investigators, federal and state SNAP administrators, BCC's external accountant and a review of BCC's business records." (*Id.*)

### (2) Application of *Brady* Principles

"In *Brady*, the Supreme Court held that a criminal defendant's due process rights are violated if the prosecution suppresses exculpatory evidence that is material to the defendant's guilt or punishment." *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) and *Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)). "There are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler*, 527 U.S. at 281-82. "A deprivation of due process occurs where all three elements are present." *United States v. Dado*, 759 F.3d 550, 560 (6th Cir. 2014). The Defendants have the burden of showing these three elements in order to establish a *Brady* violation. *Id.* at 559 (affirming district court's denial of the defendant's motion for a new trial based on an alleged *Brady* violation).

With respect to the third element, "[p]rejudice (or materiality) in the *Brady* context is a difficult test to meet." *Montgomery*, 654 F.3d at 678 (internal quotation marks omitted). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States*

8

*v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555 (1995); *see also United States v. Winston*, 55 F. App'x 289, 296 (6th Cir. 2003) ("in the context of an alleged *Brady* violation, a new trial may only be granted if the defendant shows that 'the undisclosed evidence undermines confidence in the outcome of the trial'") (quoting *Kyles*).

The question of materiality involves a consideration of "the totality of the evidence—and not merely exculpatory facts in isolation." *Montgomery*, 654 F.3d at 679; *see also United States v. Ramer*, 883 F.3d 659, 672 (6th Cir. 2018) ("The materiality inquiry involves weighing the value of the undisclosed evidence relative to the other evidence produced by the state") (internal quotation marks omitted); *Dado*, 759 F.3d at 562-63 (considering both the alleged undisclosed evidence and the evidence that the jury had heard at the trial in determining that the defendant had not established that he had suffered a *Brady* violation); *Winston*, 55 F. App'x at 297-98.

Here, the Court's analysis does not require a determination of whether the Government <u>actually</u> withheld the data alleged by the Defendants. For purposes of the Motion, the Court assumes that the Government did withhold the data.[4] Yet, even with this assumption and also

---

[4] Regarding the May 6, 2016 transaction initiated at BCC using a government-controlled EBT card, at the February 10, 2020 evidentiary hearing concerning the amount of loss, Chad Fannin (an enforcement agent for the Ohio Department of Public Safety Investigative Unit) testified that the questioned transaction: (a) pre-dated the formation of the BCC federal task force investigation by approximately 11 months; (b) was not connected in any way to the task force investigation; (c) was, in fact, a "successful" transaction that went through; (d) was completed not by an undercover operation or confidential informant, but rather by a known drug dealer; and (e) was not an attempt by someone at the request of investigators to engage in cash-for-benefits transactions at BCC. (Doc. 127 at PAGEID # 2210-13.) However, the Court cut off questioning concerning this item. (*See id.* at PAGEID # 2213-14.) For purposes of the Motion, the Court also assumes that the May 6, 2016 transaction was an unsuccessful controlled

assuming that Defendants have shown the first and second elements of a *Brady* violation,[5] Defendants have not shown the third element: that prejudice must have ensued. *Strickler*, 527 U.S. at 281-82; *Dado*, 759 F.3d at 559.

The Court finds that the withheld evidence (i.e., transactional data from the ALERT database for BCC and comparator stores) was not "material" when viewed in the context of the evidence presented at trial and the crimes for which the Defendants were charged (and convicted). *Bagley*, 473 U.S. at 682; *Montgomery*, 654 F.3d at 679; *Ramer*, 883 F.3d at 672; *Dado*, 759 F.3d at 562-63. As an initial matter, the Defendants admit that SNAP fraud did occur at BCC. (*See* Doc. 128 at PAGEID # 2310; Doc. 132 at PAGEID # 2368.) Specifically, they concede that 10 fraudulent transactions took place that involved Randy and the Government's confidential informant.[6] (*Id.*) Additionally, neither party argues that data from the ALERT database itself, whether at the summary level or transactional level, definitively shows that any particular transaction is fraudulent or is not fraudulent.[7]

Apart from the testimony of Randy and Waller that directly implicates Michael, particularly damaging for Defendants is the testimony from Reid, referenced above. Defendants' Motion and Reply ignore Reid's testimony. (*See* Doc. 132 at PAGEID # 2368 (asserting that "[t]he only witnesses who testified about fraudulent transactions other than the 10 CI transactions were Randy Busch and Tim Waller").)

---

attempt to initiate fraudulent SNAP transactions at BCC, as the Defendants allege (Doc. 128 at PAGEID # 2311).
[5] The Government appears not to dispute the presence of the second element. (*See* Doc. 131 at PAGEID # 2352 (in the Motion, "the defense fails to establish either the first or third prong of a *Brady* violation").)
[6] Defendants also concede that Michael was present at BCC during some of the charged confidential informant transactions, although he did not deal directly with the confidential informant. (Doc. 132 at PAGEID # 2368.) Video of fraudulent transactions at BCC involving the confidential informant were shown at trial. (*See* Doc. 108.)
[7] *See also* Doc. 112 at PAGEID # 1500 (Special Agent Greg Engelhard testifying that a "comparison analysis," which uses data from the ALERT database, is "a typical investigative tool used by the USDA OIG in SNAP fraud investigations").

The focus of Defendants' argument is on the number of fraudulent transactions at BCC.[8] By way of affidavit attached to the Reply, Defendants' expert witness, Bruce Yasukochi, states that, based on his analysis of the data, "the ALERT transaction data does not indicate a meaningful level of fraud occurring at BCC relative to the 'comparison stores.'" (Doc. 132-3 at PAGEID # 2421.) Mr. Yasukochi further opines in the affidavit that "there was not widespread food stamp fraud occurring at BCC" and that "several government witnesses (such as Tim Waller) either did not tell the truth at trial or grossly exaggerated transaction volumes." (*Id.* at PAGEID # 2422; *see also* Doc. 128 at PAGEID # 2318-19 (explaining that "Mr. Yasukochi's opinion, based on his study of the ALERT transaction data, is that the amount of SNAP fraud occurring at [BCC] over the relevant period was within one standard deviation from that occurring at the 'comparable' stores that the government had identified as similar to [BCC]")).

However, the Government did not need to establish, and the jury did not need to find, "widespread food stamp fraud occurring at BCC" in order for the Defendants to be convicted of the counts on which they were found guilty. The Defendants were found guilty of <u>conspiracy</u> to defraud the United States, and Michael was further found guilty of SNAP fraud and wire fraud with respect to <u>eleven specific transactions</u> that were identified in both the Second Superseding Indictment and the completed Jury Verdict Forms by date, EBT Beginning Balance, EBT Ending Balance, and EBT card number. (*See* Docs. 48 and 97.)

Using ALERT transactional data to demonstrate that there was not nearly as much food stamp fraud as the Government believed (and to impeach witnesses' estimates of how much food

---

[8] *See, e.g.,* Doc. 132 at PAGEID # 2366 (Defendants arguing that, "[m]ost importantly, however, the data shows that any cash-for-benefits fraud that occurred at BCC was anything but widespread—in fact, an analysis of the ALERT transaction data for BCC and the 'comparison stores' proves that, statistically speaking, it was isolated and rare").

stamp fraud was occurring at BCC) does not meet the standard necessary to vacate the Defendants' convictions. The testimony set forth above—as well as the wealth of other evidence presented at trial and the undisputed fact that SNAP fraud did occur at BCC—provides more than sufficient confidence in the jury's verdict, even in light of the transactional data at issue and the Defendants' expert's opinion of what such data shows. The Court finds that there is <u>not</u> "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Instead, the jury's verdict is worthy of confidence, and the Court finds that Defendants received a fair trial despite the absence of the transactional ALERT system data. *Dado*, 759 F.3d at 560.

Accordingly, the data that the Government failed to disclose is not *Brady* material. *See id.* at 560-63 (affirming district court's denial of motion for a new trial on the grounds of an alleged *Brady* violation because the suppressed evidence was not material). Defendants have not shown that "prejudice must have ensued"—a requirement for a *Brady* violation. *Strickler*, 527 U.S. at 281-82. Therefore, the Court finds that, even if the Government suppressed the evidence that Defendants allege the Government suppressed, that suppression does not constitute a *Brady* violation.

### III. <u>CONCLUSION</u>

Accordingly, based on the foregoing, the Court **DENIES** Defendants' Motion to Vacate Conviction (Doc. 128). The Court **ORDERS** the parties to appear for sentencing and disposition on Tuesday, June 30 at 9:30 a.m.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, April 8, 2020.

s/Thomas M. Rose
_____
THOMAS M. ROSE

UNITED STATES DISTRICT JUDGE